UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WALTER AND JULIE SCHULTZ,

        Plaintiffs,

v.

GENERAL R.V. CENTER, ET AL.,

        Defendants.

_____/

Case No. 04-72562

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANTS GENERAL R.V. CENTER'S AND DAMON CORPORATION'S MOTION FOR SUMMARY JUDGMENT [37]**

This consumer warranty case arises out of Plaintiffs' purchase of a large recreational vehicle ("RV") that was manufactured by Defendant Damon Corporation ("Damon") and sold by Defendant General R.V. Center ("General RV"). This matter is currently before the Court on Defendants' motion for summary judgment. For the reasons stated below, this Court GRANTS Defendants' motion.

**I.    Facts**

On June 1, 2003, Plaintiffs purchased and took delivery of a 2003 Damon Escaper motor home ("RV") from General RV for $192,000. The "home" portion of the RV was assembled by Damon. Damon purchased the chassis (or drive) portion of the RV from Freightliner. It then assembled the coach (or "home") portion of the RV on top of the chassis. Damon then sold the RV to General RV, who in turn sold it to Plaintiffs.

Defendant Fifth Third Bank financed the Plaintiffs' purchase of the motor home.[1]

Damon provided Plaintiffs with an express limited warranty for a period of one-year or 12,000 miles.  (Defs.' Ex. 3.)

Following delivery, Plaintiffs had several repairs performed on the RV, all done by General RV.  Plaintiffs present repair invoices covering the time period from June 23, 2003 to June 26, 2004.  Each repair invoice has one of the Plaintiff's signatures following the express statement that, "I have inspected my vehicle and repairs performed are satisfactory."  (Pls.' Ex. A.)

On June 26, 2004, Plaintiffs took their RV in for repairs for the last time.  Notably, they made no complaints about roof defects or water leaks.  (*Id.*)  Following completion of the requested repairs, Plaintiffs took a trip in the RV to Gatlinburg, Tennessee.  This was over the Fourth of July holiday.  After they returned from the trip, Plaintiffs drove the RV to a storage facility and have not driven it since.  (Pl.'s Ex. B, Julie Schultz Aff. ¶ 4.)

Plaintiffs filed this action on July 12, 2004, against Defendants General RV, Damon, and Fifth Third Bank.  Plaintiffs' complaint alleges that the RV was sold to them in a defective state, that the RV was out of service for repairs on at least five occasions for a variety of defects during the first four months of ownership, and that it continues to be in a defective state. (Compl. ¶¶ 9, 10.)  Plaintiffs' complaint asserts the following claims:  (1) breach express and implied warranties of merchantability in violation of Michigan law (Count I); (2) revocation of acceptance under Michigan law (Count II); (3) breach of express and implied warranties in violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§

---

[1]Plaintiffs' claims against Fifth Third Bank were dismissed on December 16, 2004. (Order, Doc. No. 14.)

2

2301, *et seq.* (Count III); and (4) violation of Michigan's Consumer Protection Act, Mich. Comp. Laws §§ 445.901, *et seq.* (Count IV).  Plaintiffs' primary complaint is that the RV is defective because it currently has water leaks, non-functioning and leaking slide-outs, and roof defects that have caused them to "lose faith" in the RV.  (Julie Schultz Aff. ¶¶ 5-6.)

Plaintiffs have voluntarily dismissed their state-law misrepresentation/negligence claims.  This Court granted Damon summary judgment on Plaintiffs' revocation of acceptance claims.  (4/3/06 Order.)   The claims remaining are:  (1) revocation of acceptance (against General RV only); (2) breach of an express warranty (against Damon only);[2] (3) breach of implied warranty against Damon and General RV; and (4) Plaintiffs' derivative claims for violation of Michigan's Consumer Protection Act and the Magnuson-Moss Warranty Act.

Plaintiffs' complaint provides a laundry list of problems with the RV; some patently minor, others sounding more serious.  Alleged defects include:

> entry door handle, freezer door seal, shower door hinge pins, entry step modulator, bathroom awning will not pull down, molding on slide closet, chip in driver's mirror, missing wiper blade, missing wand for bathroom blinds, dryer vents, entry door weather stripping, fender skirt, compartment doors, window leaks, not hot water from water heater, bathroom exhaust fan handle, fuel cap, panel loose, compartment locks, light under t.v. inop, excessive "squeaking" noises from entry door, satellite t.v. not working, cable hookup problems, stain on ceiling, front bezel cracking, no sound from dvd player, living room slide does not close completely, rear air conditioner leaking, lights inop under stereo cabinet and freezer, screws missing from front dash, front dash pulling apart, driver's mirror vibrates, front air suspension not holding pressure, missing molding from passenger side trim, roof leaks above stereo cabinet, rotten smells, driver's side door misaligned, light over shower area inop, screws in slide track loose, loose screws on entry steps, window seals, ceiling lights, ceramic tiles have stress cracks, front cowel caving in, driver's

---

[2]General RV did not provide any express warranties, and Plaintiff does not argue otherwise.  (*See* 4/3/06 Order discussing General RV purchase agreement.)

roof fiberglass creasing, fiberglass below windshield creasing, water pooling
on the roof, crack in the roof, water leaks.

(Compl. ¶ 18.)

## II.   Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

4

III.   **Analysis**

   A.  **State-Law Express Warranty Claims Against Damon**

Plaintiffs, lumping all Damon-related repairs together, argues that Damon's express limited warranty failed of its essential purpose because the repairs failed to cure defects in materials or workmanship attributable to Damon; i.e., water leaks, roof defects, and problems with the slide-outs, and thus caused them to "lose faith" in their RV.  Defendant Damon, relying on the opinions of its experts, argues that Plaintiffs' breach of express warranty claims against it should be dismissed because no genuine issue of material fact exists on this issue.  This Court agrees with Damon.

Damon, in its written limited warranty, provided a one-year warranty (beginning June 1, 2003) for Damon-manufactured or assembled parts or 12,000 miles, whichever first occurs.  The limited warranty further provided that it covered only materials, components, and parts manufactured and assembled by Damon, and the exclusive remedy under the warranty was to "repair or replacement" of defective materials or workmanship of Damon parts:

> Damon's obligation to repair or replace defective materials is the sole obligation of Damon under this Limited Warranty.  Damon specifically makes no warranty as to the future performance of this RV or any of its materials, components, or parts.

(Defs. Ex. 3, Damon Limited Warranty at 5.)  Coverage was also expressly excluded for, among other things:

> [n]ormal wear and usage; . . . [p]eriodic maintenance, including but not limited to re-caulking the body of the RV, tightening screws, adjusting doors, lubricating, . . . replacement or repair of items as a result of RV use, wear or exposure, such as oil, filters, brake pads, and linings; [and] [a]ny material, component, or part of the RV that is warranted separately by its manufacturer. . . .

5

(*Id.* at 5-6.)

As to claimed defects, the limited warranty provided that:

> The RV owner's obligation to notify Damon or one of its authorized, independent dealers of a claimed defect does not replace, alter, or modify the obligations, if any, placed on the RV owner to contact Damon directly when pursuing remedies under applicable state or federal laws.  When any claims or repairs are not addressed by the authorized Damon dealer, it is the RV owners responsibility to contact Damon directly in writing.

(*Id.* at 5.)     So, rather than first filing a lawsuit over claimed defects, the limited warranty required the RV owner to contact an authorized Damon dealer to repair or replace the alleged defect or to contact Damon in writing.

The limited warranty also expressly limited all implied warranties, including any implied warranty of merchantability or fitness for a particular purpose, to the same duration and terms as in the express limited warranty.  It also expressly provided that the performance of repairs or needed adjustments were the exclusive remedy for the express Limited Warranty and any implied warranties.  All incidental or consequential damages, including payments on installment retail loans, were expressly excluded.

> DAMON EXPRESSLY LIMITS ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND OTHER IMPLIED WARRANTIES APPLICABLE TO THIS RV TO THE DURATION OF DAMON'S EXPRESS WRITTEN LIMITED WARRANTY ONE (1) YEAR OR TWELVE THOUSAND (12,000) MILES, BEGINNING ON THE FIRST DATE THAT EITHER THE RV IS TENDERED TO THE FIRST RETAIL PURCHASER, OR THE DATE THAT THE RV IS FIRST PLACED IN SERVICE BY THE DEALER FOR PERSONAL USE PRIOR TO SALE AT RETAIL. PERFORMANCE OF REPAIRS OR NEEDED ADJUSTMENTS IS THE EXCLUSIVE REMEDY UNDER THIS WRITTEN LIMITED WARRANTY OR ANY IMPLIED WARRANTY.  DAMON SHALL NOT BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST WAGES, PAYMENTS ON ANY INSTALLMENT RETAIL LOAN, OR VEHICLE RENTAL EXPENSES) RESULTING FROM BREACH OF THIS WRITTEN LIMITED WARRANTY OR ANY IMPLIED WARRANTY.

6

(*Id.* at 6.)

The repair history on the RV shows that for the one-year period of time that the express warranty was in effect, several repairs were made on Plaintiffs' RV. These include:

6/23/03    Repairs to entry step, freezer door, shower door, rock guard, bathroom awning, entry door handle, screws on living room slide, molding, driver side mirror, bathroom blind wand, wiper blade cover, shade strip, dryer vent (cosmetic);

7/9/03    More latches for shower door, install satellite dish, install air vents, adjust compartment doors, entry door weather stripping repaired;

7/28/03    Replaced driver side window seal; adjusted slide gear and tracking on main slide; reworked seal and sealed top corner of slide on main slide at dinette booth; repaired water heater; replaced bathroom exhaust fan handle; secured drier rear panel; check fuel door/cap; lube and adjust compartment locks; tested light under TV; readjust wipers to reduce noise; adjust and lube entry door to eliminate squeak; fix shower door hinge and track; remove and replace driver side mirror; replace entry door handle (pitted); reroute satellite ground cable; tighten bolts on cable hookup; sealed all voids in sealant in front of coach to address water stain on ceiling; removed and replaced TV bezel (from above water leak); replace driver's window screen; tested light over sink; put wires in for rear receiver;

8/08/03    changed oil in generator;

9/12/03    checked LP tank for leak and found bleder value open a little; checked fuse and installed new ground wire;

9/15/03    in response to bad smell complaint, found vent stack too tall and obstructed by cap; repaired by cutting down tube and reinstalling stack cap; replace shower door hinge pin; fix squeaky front door; adjusted side compartment door; hooked up frig fan; secured wardrobe mirror door, repaired bathroom ceiling fan light; repaired weather stripping on entry door; repaired and regrouted a ceramic tile outside bathroom door; repair entry step; replace light bulb over shower area; repair fastener on floor mat; repair top bracket on refrigerator; reposition rear view mirror; install rubber grommet on range top; install new screws on dash kick panel; stress crack front driver's side top corner; headlights not set right; rubber seal for turn signals falling off;

10/15/03    repaired stress crack front driver's side top corner; repaired defroster

hose under hood; adjusted headlights; removed and paired rubber seals on side turn signals; complaint of fiberglass crack determined to be seam lines and normal;

11/15/03   winterize

11/24/03   tile floor repair

4/01/04   lubed entry door for squeaks; repaired water leak in roof both in front and behind entry door by replacing cracked caulking and resealing; removed instruction booklet left in fan in furnace; repaired leak in green air line – needs to go to chassis dealer for repair;

4/24/04   headliner stained and sublet out for carpet care; carpet stains removed with Brown Out;

5/19/04   cleaned water stain off wall and ceiling near radio cabinet passenger side; repaired wire to lights over kitchen slide out; stress cracks in roof near rear passenger slide and front driver's corner – sublet out for paint repairs; recaulk around front and passenger side, reseal, and pressure tested unit; re-lube entry door for squeaks; cleaned grease stains off carpet;

6/03/04   Work done on Ford Explorer.

(Pls. Ex. A, Bates Nos. 000108 to 000288.)

Each time a repair was made, either Mr. or Mrs. Schultz signed the completed repair invoice under a statement providing that:   "I have inspected my vehicle and repairs performed are satisfactory."  (Pls.' Ex. A.)   On the May 2004 invoice, where Plaintiffs complained about stress cracks and inadequate caulking on the roof, Plaintiff Julie Schultz signed this clause but added "except where noted!"  (Defs.' Reply, Ex. 1, 5/19/04 Work Order #821912; Ex. 2, Julie Schultz Dep. at 115.)  As to the caulking, there is a notation that the customer had an "issue with white caulk."  (*Id.*)  At her deposition, Plaintiff Julie Schultz testified that, although the caulking was repaired, it was not to her satisfaction because she thought it looked like "a three-year-old did the caulking."  (J. Schultz Dep. at

8

114-115.)   As to the stress cracks on the roof, there is a handwritten notation that "customer to check work on roof at home."   (Defs.' Reply, Ex. 1, 5/19/04 Work Order #821912.)  Despite this statement, Plaintiffs did not request additional repairs on the roof during the warranty period.  In fact, the last time Plaintiffs sought repairs for their RV was on June 26, 2004, and there was no mention of problems with the roof.

The June 26, 2004 invoice contains Plaintiffs' last request for repairs and shows that: the satellite was reprogrammed; the DVD player was repaired; the water valve on the hot water tank was opened all the way and checked; the living room slide was adjusted; the lights in front of the cabinets were rewired; and as to Plaintiffs' complaint about the stereo not playing through surround, it is noted that the customer will return at later date.  (*Id.*, 6/26/04 Invoice, Bates No. 000301-302.)  Notably, Plaintiffs did not complain about roof defects or water leaks.

On June 30, 2004, Mrs. Schultz picked up the RV and signed the statement that she had inspected the RV and repairs were performed to her satisfaction.  (*Id.*)  Plaintiffs were not charged for these repairs even though some did not fall under Damon's Limited Warranty (satellite and DVD player) and the one-year warranty period had expired.

After this last repair, Plaintiffs took a trip to Tennessee in early July 2004.  Upon their return, they did not return to General RV for repairs nor did they write to Damon about any defective materials or workmanship.  Rather, they filed this lawsuit on July 12, 2004.

The record reveals that each time repairs were requested during the one-year limited warranty period they were made free of charge to Plaintiffs and, as reflected by signatures on the various invoices, they were done to their satisfaction.  With each repair request, the RV was repaired, returned to Plaintiffs in a timely manner, accepted and used.  As to their

9

current complaints, Plaintiffs did not, as required under the limited warranty, contact Damon in writing about continued problems with their RV prior to filing suit on July 12, 2004. No genuine issue of material fact exists regarding a breach of the express limited warranty. There was no breach. *See Kovac v. DaimlerChrysler Corp.*, No. 265761, 2006 WL 1293213, *2 (Mich. Ct. App. May 11, 2006) (citing *Computer Network, Inc. v. AM Gen. Corp.*, 265 Mich. App. 309, 314; 696 N.W.2d 49 (2005)).

After Plaintiffs filed this lawsuit on July 12, 2004, they began to store the RV, covering it with a tarp and occasionally starting it up and running it. On January 2, 2006, Defendants had three experts inspect the RV: Christopher Dietrich, Michael Bukowski, and Jason Quillen. Each provide a written, signed, and notarized expert report. (Defs. Ex. 6-8.) These experts are well-trained in the RV industry, having more than 60 years experience in the RV and automotive industry. (*Id.*) Jason Quillen is the Service Manager of General RV's Brownstown location, where the motor home in question was purchased and where Plaintiffs had most of their service work performed. Chris Dietrich is the Service Director for General RV's five dealerships throughout the State of Michigan. Mike Bukowski runs the service department at Damon Corporation and travels the county inspecting motor homes.

The inspection took place with Plaintiffs present and considered each item Plaintiffs claimed required repair: water leaks, driver's side window leak, air conditioning unit leak, interior lights, cracking underneath slide rooms, loose screws on the dash, driver's rear mirror vibrating when driving, window seals shrinking, front air suspension, passenger side trim molding, roof concerns, buckling of the roof, gasket/sweep seal, front corvel caving, driver's roof front fiberglass creasing, creasing of outer shell below windshield, water

10

pooling on roof, audio system, air conditioning, mildew smell, swivel chair, slide room extending, and miscellaneous items.  (*Id.*)

Each expert report contains the same conclusion:  (1) as to alleged water leaks, none were found at the inspection; (2) as to the alleged water leak in the back bedroom, the problem is condensation, not a water leak; (3) there is no evidence that cracks in the outer most layer of the RV roof have caused water infiltration; (4) the maintenance and service work required on the vehicle is normal in the RV industry; (5) the RV is of at least average quality and fit for the purpose of RVing; (6) the RV does not have substantial defects in materials or workmanship; (7) Plaintiffs' current complaints about the RV do not substantially impair its value; and (8) those complaints and the RV's repair history do not give rise to a breach of Damon's express warranty or any implied warranties.  (*Id.*)

Each expert opinion is based on the expert's training and experience in the RV industry, a review of (1) Plaintiffs' deposition transcripts, (2) service history of the RV, (3) the January 2006 inspection, (4) sales and service records on the RV; and (5) additional information provided by Plaintiffs during the January 2006 inspection.  (*Id.*)

The expert reports provide as follows.

<u>Alleged Water Leaks:</u>

Plaintiffs' biggest concern appears to be alleged water leaks.  Water, water marks, and stains were found inside the RV.  After a thorough investigation, the experts concluded that Plaintiffs' current water concerns pertain to a condensation issue caused by Plaintiffs' storage of their RV at a storage facility with a tarp over it.  This conclusion was reached because no specific saturation point was found in the RV.  If, as Plaintiffs alleged, there was a leak in the roof air conditioning unit, the roof, the side walls or the slide rooms, a

saturation point would have been found somewhere in the RV. Instead, evidence of water was found in numerous spots. Wetness was found all over the back bedroom, including the bedspread, carpet and walls. It was discovered that this back bedroom heats up when the RV engine is running. The RV is a "diesel pusher" with the engine located in the back of the RV below this back bedroom, and heat rises into the bedroom. If a tarp is placed over the RV, the heat has no good place to escape. Plaintiffs confirmed at the inspection that they go to the storage facility periodically to start the RV and some of its components. At times they take the entire tarp off, other times they take only part off. Plaintiffs re-tarp the RV immediately after running the engine and component parts. Thus, the back bedroom is warm when the RV is re-tarped. This appears to be causing a condensation issue in the back bedroom. The problem has been enhanced by mild winter temperatures. With the RV tarped, without any ventilation during mild weather conditions, condensation has also occurred throughout the motor home. (Ex. 6 at 3-4, Ex. 7 at 3-4, Ex. 8 at 3-4.)

As to the complaint of a mildew smell in the bathroom, Plaintiffs clarified during the inspection that the smell was in the back bedroom. A mildew smell was confirmed in the back bedroom but nowhere else in the RV. It was determined that the condensation problem has caused water to accumulate in this back bedroom thus causing the mildew smell. This is not caused by a defect in material or workmanship. (Ex. 6 at 9, Ex. 7 at 9, Ex. 8 at 9.)

As to Plaintiffs' complaint of a water leak at the driver's side window, none was found despite water testing. When the water was turned up high, water was observed passing through the window seal and out weep holes. This is completely normal for RV windows. (Ex. 6 at 4, Ex. 7 at 4, Ex. 8 at 4.)

As to Plaintiffs' complaint that the rear air conditioning unit leaks onto the bed, no leak was found. The air conditioner was run, and water was run on the roof of the RV near the rear air conditioning unit. No leaking was observed. (*Id.*)

As to Plaintiffs' complaint about water pooling on the roof, some pooling was observed when water tests were run. This is normal for the RV industry, and it should not cause any concerns. Although the roof is crowned on the RV, over time shifting occurs and water sometimes puddles. This is normal in the RV industry. Because no water infiltration was found, the pooling is not causing any problems. (Ex. 6 at 8, Ex. 7 at 8, Ex. 8 at 8.)

<u>Roof Concerns</u>:

Plaintiffs complain of problems with the RV roof, including alleged water leaks, roof cracks, and buckling. Despite Plaintiffs' beliefs to the contrary, no evidence of leaking from the roof was discovered during the inspection. A great deal of water was sprayed all over the motor home, and no leaks were found.

The inspection did confirm the existence of some cracks in the roof. The rear passenger side of the RV has a crack on the roof. There was no evidence of any damage to any other portion of the RV as a result of the cracks, including no evidence of water infiltration despite extensive water testing. The problem is thus limited to the roof. The experts were unable to discover a cause for the crack and had no evidence that it was related to a defect in Defendant's material or workmanship.

Cracks were also confirmed on the front, driver's side of the roof. General RV had previously performed some work in this area, but it does not appear that the same areas re-cracked. Rather, it appears that there are new cracks in the same general area. No evidence was found of a defect in material or workmanship. There was no evidence of

water infiltration from these cracks.

As to both, Defendants' experts opine that the cracks can be repaired by removing a section of the roof and having it re-worked.  (Ex. 6 at 6-7, Ex. 7 at 6-7, Ex. 8 at 6-7.)  They do not attribute the cracks to a defect in Defendant's material or workmanship.

Plaintiffs also complain about buckling of the roof.  Although the experts saw conditions that could lead someone to make this complaint, they did not find anything out of the ordinary for the RV industry.  The appearance of the roof on Plaintiffs' RV is like that of many RVs.  There are no buckling concerns, and no concerns with the construction or appearance of the RV's roof.  (Ex. 6 at 7, Ex. 7 at 7, Ex. 8 at 7.)

Plaintiffs complain that the area where the roof meets the front cap is "caving in."  The experts discerned that, although it gives the appearance, the roof is not "caving in."  Rather, by design, the cap comes over the rest of the roof a bit in this area and the roof dips down a bit.  The appearance is normal.  (Ex. 6 at 8, Ex. 7 at 8, Ex. 8 at 8.)

Creasing Concerns:

Plaintiffs' complaints about fiberglass creasing on the roof on the driver's side is addressed above under roofing complaints.

Plaintiffs also complain about creasing of the outer shell below the windshield.  Some minimal creasing was confirmed in this area, probably related to the fiberglass.  This cosmetic concern is readily addressed by a simple fiberglass repair.  (Ex. 6 at 8, Ex. 7 at 8, Ex. 8 at 8.)

Slide Room Complaints:

The experts did not find any cracking underneath the slide rooms.  When asked, Mrs. Schultz pointed to an area underneath the slide room, next to the exterior wall where a slide

14

gasket seals the slide room.  Even after she pointed to this area, no cracks were located. (Ex. 6 at 5, Ex. 7 at 5, Ex. 8 at 5.)

Plaintiffs pointed out that the gasket/sweep seal above the living room slide had fallen out, and appeared concerned that this would allow water to get into the slide room.  No evidence of water was found in this area even when water was run on the roof or when water flow was concentrated in the slide room, dinette, and living room areas.  The gasket causing Plaintiffs' concern is an outside gasket.  The slide rooms have other seals that prevent water from getting into them.  Thus, the absence of this gasket has not caused any problems.  It is common for such gaskets to fall off RVs.  Repair would involve sliding the gasket back into the area from which it came loose and putting some adhesive on it.  This would be an extremely simple repair.  (Ex. 6 at 7, Ex. 7 at 7, Ex. 8 at 7.)

Plaintiffs also complaint that the slide room extends on its own when they are driving. The experts' investigation revealed that the brake for the slide room was off.  They showed Plaintiffs how the brake is designed to allow RV users to get the slide room in and out if they loose power.  They also explained that if the brake accidentally gets turned off, then the slide mechanism may not hold it in place.  At Plaintiffs' request, the brake was placed in the correct position, and the problem was resolved.  (Ex. 6 at 10, Ex. 7 at 10, Ex. 8 at 10.)

Miscellaneous Issues:

Despite Plaintiffs' complaint that the some interior lights were not working, they worked on the day of the inspection.

It was confirmed that some screws need tightening.

Despite claims that the RV mirrors vibrated, none were found to do so when taken for

15

a test drive.

Plaintiffs' confirmed that their issue with the front air suspension had been resolved.

As to complaints of seals shrinking at the entry door and windows, the experts confirmed that the molding around several windows had changed in size, and determined that this was only a cosmetic issue.  Moldings are designed to expand and contract and sometimes leave small gaps around the windows.  It was determined that this was not causing any problems with the RV, and if Plaintiffs wished to correct this cosmetic problem, the molding could easily be replaced.  As to a confirmed gap in the passenger side trim molding, a simple repair of sliding the molding forward would correct it.

As to confirmed problems with the audio system, the experts note that this is a component part not covered by Damon's limited warranty and one that could be easily cured.

Despite Plaintiffs' complaints to the contrary, the air conditioning units all blew cold air during the inspection.

The experts re-latched the swivel chair, fixing it.  There is, however, a rusty mechanism underneath the chair, and it could use some additional minor work.

Finally, WD40 was sprayed on two outside locks to cure Plaintiffs' complaint that they were unable to use them.  (Exs. 6-8 at 4-10.)

Plaintiffs do not provide any admissible evidence refuting Defendants' experts' opinions.  First, they present an "estimate" for roof repairs in the amount of $9,209.52.  This estimate is not attached to a signed, notarized affidavit by the person who prepared it.  It is inadmissible hearsay that, even if admissible, fails to refute the conclusions in Defendants' experts' reports.  Plaintiff Julie Schultz testified that Plaintiffs took the RV to

16

Aachen Auto primarily "for them to look at the roof and give us recommendations on either how to repair it or what needed to be done to prevent further problems." (J. Schultz Dep. at 14.)  Plaintiffs did not request and Aachen Auto did not provide any opinion as to the cause of current RV problems, whether these problems arose during the warranty period, or whether they were previously repaired unsatisfactorily during that warranty period. Accordingly, even if admissible, the repair estimate is not probative as to whether Defendants had breached their limited warranty or whether that warranty had failed of its essential purpose.

Plaintiffs' affidavits likewise fail to refute Defendants' experts' opinions that no defect in materials or workmanship caused the problems Plaintiffs now complain about.  The affidavits and the attached photographs, taken both before and after the January 2006 inspection, are insufficient to refute the causation opinions expressed by Defendants' experts.  The mere fact that Plaintiffs proffer evidence showing the presence of water inside the RV and an estimate for repairs they want done on the roof is insufficient to allow a reasonable jury to conclude that, contrary to Defendants' expert opinions, a defect in Damon's material or workmanship caused these problems during the time period that Damon's written limited warranty was in effect.

Plaintiffs also claim that, despite Damon's attempts to do so, it failed to repair leaks, roof defects, and slide-out problems and thus Damon's limited warranty has failed of its essential purpose.  This Court disagrees.

Under Michigan's Uniform Commercial Code, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act."  Mich. Comp. Laws Ann. § 440.2719(2).  The Michigan courts have observed

17

that "[w]here a manufacturer or dealer has limited its obligation . . . to repair or replace defective parts, the seller does not have an unlimited time to make the repairs, but rather must repair or replace the parts within a reasonable time." *Computer Network, Inc. v. AM Gen. Corp.*, 696 N.W.2d 49, 55    (Mich. Ct. App. 2005) (internal quotes and citations omitted).

Damon's written limited warranty expired on June 1, 2004.  Each time Plaintiffs' RV was presented for repair, the repairs were completed, and Plaintiffs accepted the RV and continued to use it after the limited warranty expired. None of the evidence Plaintiffs proffer refutes Defendants' evidence showing that there was no breach of the written limited warranty or that the limited warranty failed of its essential purpose.

That Plaintiffs' RV was previously serviced is not enough to establish a breach of Damon's express warranty.  *See Ducharme v. A&S RV Center*, 321 F. Supp.2d 843, 850-51 (E.D. Mich. 2004) (similarly observing that (1) "the fact that the motor home was previously repaired does not establish a breach of an express warranty", (2)  some service on a complex product like a motor home is inevitable, and (3) there is no breach when the manufacturer is willing to repair an existing problem under the warranty), *aff'd*, No. 04-1224, 127 Fed. Appx. 204 (6th Cir. May 3, 2005).  Moreover, Plaintiffs cannot establish a claim that the limited warranty's exclusive remedy of repair or replacement of Damon-manufactured or assembled parts failed of its essential purpose by lumping together all the repairs and the aggregate amount of time his RV was out of service.  *See Computer Network, Inc. v. AM Gen. Corp.*, 696 N.W.2d 49, 55 (Mich. Ct. App. 2005)(observing that the plaintiff cannot rely on the aggregate number of repairs to argue that there is a question of fact whether the time for repairs was unreasonable but rather must offer evidence as to

18

each specific repair showing that the time for that repair was unreasonable under the circumstances).

Finally, to the extent Plaintiffs claim damages representing incidental and consequential damages, including payments on any retail installment loan, these were expressly disclaimed in Damon's limited warranty.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' express warranty claims.

### B.  State-Law Breach of Implied Warranty Claim

Plaintiffs also claim that the Damon RV was subject to an implied warranty of merchantability, pursuant to Mich. Comp. Laws Ann. § 440.2314, and that Defendants breached that implied warranty because, despite numerous attempts at repair, the RV still leaks and has roofing problems.  Defendants argue that there is no evidence of any breach of an implied warranty of merchantability.

Michigan's Uniform Commercial Code provides that "(1)[u]nless excluded or modified . . . , a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind," and that "(2) [g]oods to be merchantable must be at least such as . . . are fit for the ordinary purposes for which such goods are used."  Mich. Comp. Laws Ann. § 440.2314.  Damon's limited express warranty notifies Plaintiffs that "any implied warranty of merchantability, fitness for a particular purpose, or other implied warranties applicable to this RV to the duration of Damon's express written limited warranty" and that the exclusive remedy under any implied warranty is repair or adjustment.  (Defs.' Ex. 3, Limited Warranty at 6.)

As to goods accepted, the burden is on the buyer to establish any claimed breach of warranty.  *Guaranteed Const. Co. v. Gold Bond Products*, 395 N.W.2d 332, 336 (Mich. Ct.

App. 1986).  Plaintiffs have not met this burden.

> To establish a prima facie case of breach of implied warranty, a plaintiff must show that goods were defective when they left the possession of the manufacturer or seller.  Under implied warranty theory, a defect is established by proof that a product is not reasonably fit for its intended, anticipated or reasonably foreseeable use. Merchantable is not a synonym for perfect. . . .  The warranty of merchantability is that goods are of average quality in the industry.

*Computer Network*, 696 N.W.2d at 56 (internal quotes and citations omitted) (emphasis added).  Defendants' experts opine that, based on their inspection and expertise, the RV is of average quality in the industry.  Plaintiffs do not present any refuting evidence. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' breach of implied warranty claims brought under Mich. Comp. Laws Ann. § 440.2314.

## C.  Revocation of Acceptance Claim against General RV

As discussed above, Plaintiffs have not presented evidence showing that Damon's limited warranty failed of its essential purpose.  Accordingly, Plaintiffs are not allowed to seek the remedy of revocation.  *Kelynack v. Yamaha Motor Corp., USA*, 394 N.W.2d 17, 19-20 (Mich. Ct. App. 1986).  "Under § 2-719 of the U.C.C., M.C.L. § 440.1719 . . ., the parties to a sales agreement may agree to limit remedies and damages for breach of the agreement.  However, subsection (2) further provides that where the limited remedy fails in its purpose or operates to deprive either party of the value of their bargain, the parties may pursue other remedies provided elsewhere in the U.C.C."  *Id.* "One remedy available to a buyer for the seller's breach of warranty is revocation."  *Id.* at 20 (citing M.C.L. § 440.2608.)

## D.  Michigan Consumer Protection Act and Magnuson-Moss Warranty Claims

Plaintiffs concede that their claims brought under Michigan's Consumer Protection

20

Act, Mich. Comp. Laws Ann. §§ 445.901, *et seq.*, and the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(3), 2301(7), 2308, 2310(d)(1) and (2), are derivative of their claims that Defendants breached express and implied warranties arising under Mich. Comp. Laws Ann. §§ 440.2313 and 440.2314.   Accordingly, because this Court has determined that Defendants are entitled to summary judgment on Plaintiffs' state-law breach of express and implied warranty claims, Plaintiffs' remaining Michigan Consumer Protection Act and Magnuson-Moss Warranty Act claims likewise fail.  All claims asserted against Defendants in Plaintiffs' complaint are thus dismissed.

## IV.  Conclusion

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  September 6, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 6, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager